## W. P. CUNDIFF, ETC., *v.* GILLY CUNDIFF, ETC.

**Wills—Sound Mind and Disposing Memory—Last Sickness—Undue Influence—Former Declarations—Intention of the Testator—Want of Capacity.**

The decedent, previous to the execution of the writing purporting to be his will, had been ill for some time with some disease of the lungs. During the last ten days previous to his death, his suffering was intense and only relieved by the constant use of stimulants and opiates. His nervous system was much deranged, and he was kept alive by the constant use of opiates, and but for this would have been in his grave before the will was written. He had been resisting importunities of his son and wife to make this will for days before it was written. When approached on the subject his declarations were that he intended his children should be equal, and resulting in his constant refusal to execute such a writing. No consent was obtained from him that such a paper should be written until the night previous to his death and whilst the alleged will was being written opiates or stimulants were administered freely and two fans kept constantly in use in order to sustain life.

Many witnesses gave statements as to his delusions and the wanderings of his mind for two days and more preceding the writing of the will.

**Held,** that whether these delusions originated from the large quantities of opiates taken, or from his weak and exhausted condition, it is unnecessary to inquire. His mind was not in such a condition as to have enabled him to have a fixed and settled purpose of his own in regard to the disposition of his property.

### APPEAL FROM BULLITT CIRCUIT COURT.

#### March 29, 1872.

OPINION OF THE COURT BY JUDGE PRYOR.

James B. Cundiff died in the county of Bullitt in the year 1871, leaving his wife, Gilly Cundiff, and ten children surviving him. He owned at his death various tracts of land amounting, in the aggregate, to near one thousand acres, but left very little personal estate. He made frequent declarations during his last illness and before, of his intention to make all of his children equal in the distribution of his property. Not long after the death of James Cundiff his widow and some of the children presented to the county court of Bullitt, the county of the decedent's residence, a paper purporting to be his last will and testament, and offered the same for probate. No contest was made in regard to the validity of this paper in the county court, and upon the testimony of two of the subscribing witnesses, it was probated as his, the decedent's, last will. Seven of the children of Cundiff appealed from the order of the county court admitting the will to probate to the circuit court of that county, and the result in that court was *that the paper exhibited on the trial as the will of James Cundiff was his true last will,* and from that judgment these children have appealed to this court. They say that their father when he made the alleged will was not of sound mind and disposing memory, and that its execution was procured by an undue and improper influence exercised over him at the time of the execution of the paper, by his wife, Gilly Cundiff, and his son William. The writing in controversy gives all of his estate to his wife during her life with the direction that she is to clothe and educate his youngest children, and at her death he gives to his three sons, William, John and James, one hundred acres of land each, more than his other children, and to his daughter, Laura A. Engle, a child by his first wife, he gives a half portion, assigning as a reason therefor that he had previously

made provision for her. In making the special devise of the one hundred acres of land to each of his three sons, he locates the particular land, and it greatly exceeds in value the same number of acres in the remaining parcels of his landed estate. The one hundred acre tract given to William is worth twenty or thirty dollars per acre, whilst the balance of his land, after excluding what is given to his other two sons, is only worth ten or twelve dollars per acre. The three sons get nearly one-half in value of the real estate, and the daughter by his first wife gets only half as much as the other children. The decedent, previous to the execution of the writing purporting to be his will, had been ill for some time with some disease of the lungs. During the last ten days previous to his death his suffering was intense and only relieved by the constant use of stimulants and opiates. His nervous system was much deranged, and both physicians testify that for one or two days previous to the execution of the will, he was kept alive by the constant use of opiates, and but for this would have been in his grave before the will was written. He had been resisting the importunities of his son William and his wife to make this will for days before it was written. When approached on the subject his declarations were that he intended his children should be equal, and resulting in his constant refusal to execute such a writing. These importunities upon the part of William were so frequent that the attending physician threatened to abandon his father's case unless he ceased his efforts in that direction. It had the effect to increase the nervous excitement of the man and was tending to hurry him to his grave. No consent was obtained from him that such a paper should be written until the night previous to his death. Life was kept in him by administering stimulants and opiates constantly. And whilst the alleged will was being written opiates or stimulants were administered freely and two fans kept constantly in use in order to sustain life. Many witnesses give statements as to his delusions and the wanderings of his mind for two days and more preceding the writing of the will. Whether these delusions originated from the large quantities of opiates taken, or from his weak and exhausted condition it is unnecessary to inquire. His mind was not in such a condition as to enable him to have a fixed and settled purpose of his own in regard to

the disposition of his property, it appears that after the will was written and before it was signed by the decedent he imagined that "there was a horse in the room, and directed those present to take it out." It is hardly to be supposed that a man in such a condition could take a comprehensive view of his estate and to recognize fully the obligations settling upon him in finally disposing of his estate between his children. His declared intentions to equalize all his children in the division of his estate had been made long before his death and this intention was adhered to firmly until the advance of the disease on both physical and mental power enabled those interested in the distribution of his property to mould his will to suit their own purposes. The daughter of his first wife had by his bedside exhibited as much affection for the condition of her father as any of the other children. That affection was reciprocal upon his part. No complaint was made by this daughter upon his refusal to make a will or any effort on her part to prevent its execution. She is confined to a half share in her father's estate, upon the declaration made by him in this pretended will that he had previously provided for her. It does not appear, so far as this record shows, that she had even received one dollar, except in the presentation upon her marriage of a bed and other articles of trifling value. He had, in fact, given her nothing and recognizing an indebtedness to her by reason of his being her statutory guardian he relieves himself from liability by attempting to devise her the notes of her insolvent husband. Such a paper in the opinion of this court is not the offspring of a man able to dispose of an estate fairly and justly between one's children, or to transact the ordinary business affairs of life. The draftsman of the will had never seen the testator during his illness except during the time he was occupied in writing the instrument. His back was turned to the sick man whilst so engaged, and he held no conversation with him other than occurred in regard to the contents of the instrument itself, the substance of which had been impressed upon the mind of the testator by the repeated suggestions of the wife and son. Neither of the attesting witnesses examined for the propounders of the will give facts upon which their opinions rest as to the soundness of testator's mind, sufficient to overthrow or counter-balance the testimony of the contestants as to his want

of capacity at the date of the instrument. The attending physician explains satisfactorily why he attested the paper and as evidence of his good faith in this regard he announced his opinion publicly to Dr. McKoy upon the question of the testator's capacity before it was written. In the opinion of this court the writing in controversy is not the true last will and testament of James B. Cundiff. Wherefore the judgment of the circuit court affirming the order of the county court admitting the same to probate as the last will of James B. Cundiff is reversed with directions to set aside the verdict and judgment of that court and to enter a judgment determining that the paper in controversy is not the true last will of James B. Cundiff and to certify the same to the county court with directions to set aside the order admitting the will to probate.

*Lee & Rodman, Thompson, R. S. Meyler, for appellant.*

*A. H. Field, Wilson, for appellee.*